654 F.2d 578
 8 Bankr.Ct.Dec. 218, Bankr. L. Rep. P 68,282
 In re The HUNTINGTON LIMITED, a limited partnership, dba The
Sheraton Beach Inn, dba Driftwood Beach Club,
Debtor-Appellee.
Robert A. FISHER, Receiver, Plaintiff,
v.
CITY OF HUNTINGTON BEACH, a Municipal Corporation of the
State of California and The Huntington Limited, a
limited partnership, dba The Sheraton
Beach Inn, dba Driftwood Beach
Club, Defendants.
CITY OF HUNTINGTON BEACH, a Municipal Corporation of the
State of California, Plaintiff-Appellant,
v.
The HUNTINGTON LIMITED, a limited partnership, dba Sheraton
Beach Inn, dba Driftwood Beach Club, Debtor, and
Robert A. Fisher, Receiver, Defendants- Appellees.
 No. 79-3088.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 7, 1980.
Decided Aug. 24, 1981.
 
 Gary J. Miller, Sherman Oaks, Cal., argued, for plaintiff; Joseph C. Karol, Albert & Oliker, Los Angeles, Cal., on brief.
 Andrew S. Clare, Loeb & Loeb, Los Angeles, Cal., argued, for defendants; Marc Levinson, Sidley & Austin, Los Angeles, Cal., on brief.
 Appeal from the United States District Court for the Central District of California.
 Before: WALLACE and ALARCON, Circuit Judges, and COPPLE*, District Judge.
 ALARCON, Circuit Judge:
 
 
 1
 Appellant City of Huntington Beach, California, (City) appeals from a district court affirmance of the judgment of the bankruptcy court wherein the bankruptcy court refused to terminate a lease of real property between the City and the Huntington Limited (debtor), a limited partnership. The bankruptcy court also ordered a sale of the leasehold interest without the City's consent, and permitted the proposed assignee to hypothecate the leasehold beyond the amount originally agreed to between the debtor and the City. This court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.
 
 I. FACTUAL BACKGROUND
 
 2
 In March, 1960, the lessor City entered into a fifty year lease for undeveloped real property within the City limits with two individuals and a corporation. This prime real estate, located within close proximity to the Pacific Ocean, was improved and developed by the lessees pursuant to the terms of the lease.[1] The leasehold interest was eventually transferred to another firm and subsequently assigned to the debtor in August, 1970.
 
 
 3
 An involuntary bankruptcy petition was filed against the debtor by its creditors in June, 1976. In December of that year, the debtor filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq.[2] The bankruptcy court subsequently appointed a receiver to arrange the debtor's estate.
 
 
 4
 Since the outset of the Chapter XI proceeding, the receiver has operated the property, collected and received rents, attempted to revitalize the debtor's business and has fulfilled the debtor's obligations under the terms of the lease including the payment of rent to the City. The City has not objected to these payments.
 
 
 5
 When the receiver's attempts to rehabilitate the debtor's business proved unsuccessful, it became increasingly apparent that a sale of the leasehold interest would be the only viable alternative to the resolution of the debtor's severe financial difficulties. The receiver anticipated that a sale of the leasehold interest would raise sufficient funds to discharge encumbrances against the property, pay all unsecured creditors in full and cause the debtor to realize some return on its investment. Accordingly, the receiver applied to the bankruptcy court in December, 1977, for authority to sell the leasehold interest. The City objected to any sale, however, on the grounds that the terms of the lease required the City's consent to any assignment, transfer or hypothecation of the lease. The bankruptcy court, nevertheless, held a sale hearing on January 26, 1978 and entered an order confirming the sale to the Mayer Construction Corporation (Mayer), the successful bidder, on March 17, 1978. The order confirming the sale provided that the estate would receive three million dollars on close of escrow plus a second deed of trust in the amount of $650,000. The order also provided that Mayer would be permitted to hypothecate the leasehold beyond the.$2.1 million amount which then encumbered the estate.[3] The sale, however, was made conditional upon the voluntary consent to the assignment of the leasehold interest by the City or an order of the bankruptcy court determining that such consent was unnecessary.
 
 
 6
 Mayer and the City were unable to negotiate successfully the City's consent. Consequently, the bankruptcy court held a hearing on June 23, 1978, to determine whether the lease was terminated[4] and whether the City's consent was necessary to effect the assignment. On July 18, 1978, the court entered two judgments. The court held that the lease had not been terminated and that the City's consent to assignment was unnecessary. The district court subsequently affirmed both bankruptcy court judgments without opinion.
 
 II. DISCUSSION
 1. Termination of the Lease
 
 7
 The City contends that the district court and the bankruptcy court erred in holding that the lease was not terminated. The City asserts that the lease was terminated prior to any attempted sale because of the existence of several defaults which allegedly violated specific provisions of the lease agreement.[5] It is specifically alleged that the lease was in default because of the existence of the Chapter XI proceedings, the contemplated further hypothecation of the lease by the receiver's proposed assignment, unpaid possessory interest taxes, the failure to maintain a corporate surety bond, and the failure to maintain the property at a standard required by the lease and by applicable local ordinances.
 
 
 8
 The bankruptcy court found that no defaults existed which would justify a termination of the lease. Moreover, to the extent any defaults did exist, the court found that the City had waived them by accepting periodic rental payments from the receiver. The court concluded that it would be an abuse of discretion to permit termination of the lease because of the "horrendous forfeiture" that would accrue to the City at the expense of the debtor and the secured and unsecured creditors.
 
 
 9
 The bankruptcy court's findings of fact must be accepted by the district court unless they are clearly erroneous. Rules of Bankruptcy Procedure 810. This standard of review also applies to this court. We are "bound to accept findings of fact made by the Bankruptcy Judge and affirmed by the District Court unless such findings are clearly erroneous." In re Howell, 638 F.2d 81, 82 (9th Cir. 1980); Coen v. Zick, 458 F.2d 326, 328 (9th Cir. 1972); Fed.R.Civ.P. 52(a).
 
 
 10
 In seeking to reverse the findings of fact of the bankruptcy court, the City, as the appellant, has the burden of demonstrating that the findings are clearly erroneous. See Martin v. Mercantile Financial Corp., 404 F.2d 886, 887 (5th Cir. 1968). A mere showing that the bankruptcy court could have reached another conclusion based upon the evidence presented is insufficient. In the instant case the City has failed to meet its burden of demonstrating that the court's findings with respect to termination of the lease were clearly erroneous. Moreover, given the unconscionable forfeiture which would, in all likelihood, accompany a termination, we hold that the court did not abuse its discretion.
 
 A. The Bankruptcy Proceedings
 
 11
 The City contends that the bankruptcy proceedings constituted a default sufficient to terminate the lease because the lease provides for termination at the City's option if the lessee is "adjudged bankrupt or insolvent by any court." The bankruptcy court was correct in its finding that there was no adjudication of bankruptcy and thus no termination under the terms of the lease. The mere filing of an involuntary petition or a Chapter XI petition is not an adjudication of bankruptcy.[6]
 
 
 12
 The City also contends that the lease is in default because the Chapter XI petition was filed. The lease provides for termination at the City's option if a "transfer (of the lease) occurs by operation of law." It is conceded that the Bankruptcy Act provides that a Chapter XI receiver takes title to the assets of the debtor. 11 U.S.C. §§ 110(a), 701, 702. Thus, the City argues implicitly that the lease lapsed into default when the receiver was appointed and took title to it because a transfer of the lease by operation of law occurred at that time.
 
 
 13
 Section 70(b) of the Bankruptcy Act, 11 U.S.C. § 110(b), made applicable to Chapter XI proceedings by § 302 of the Act, 11 U.S.C. § 702, provides in pertinent part that:
 
 
 14
 (A)n express covenant that an assignment by operation of law or the bankruptcy of a specified party thereto or of either party shall terminate the lease or give the other party an election to terminate the same is enforceable.
 
 
 15
 Although the termination provision in the Huntington lease is enforceable under § 70(b), that section does not prohibit the bankruptcy court from exercising its equitable discretion to deny enforcement if compelling equitable and policy considerations so require. See Smith v. Hoboken Railroad, Warehouse and Steamship Connecting Co., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946); In re Fontainebleau Hotel, 515 F.2d 913 (5th Cir. 1975); Queens Boulevard Wine & Liquor Corp. v. Blum, 503 F.2d 202 (2nd Cir. 1974); Weaver v. Hutson, 459 F.2d 741 (4th Cir. 1972), cert. denied, 409 U.S. 957, 93 S.Ct. 288, 34 L.Ed.2d 227 (1973); In re Fleetwood Motel Corp., 335 F.2d 857 (3rd Cir. 1964).
 
 
 16
 In Smith, the Supreme Court determined that the question of the enforceability of a lease termination provision is separate and distinct from the question of whether enforcement in a particular case would be consistent with other provisions of the Bankruptcy Act. While holding that § 70(b) is applicable to railroad reorganizations, the court recognized that the public interest in maintaining the continuity of operation of a railroad line may be inconsistent with the enforcement of a forfeiture. The Court held that the district court had erred in declaring the lease forfeited and remanded the case with the proviso that the Interstate Commerce Commission be permitted to decide the question whether forfeiture of the lease was in the public interest. 328 U.S. at 131-33, 66 S.Ct. at 952-53. Smith thus established the principle that lease forfeiture clauses need not necessarily be enforced by the courts if such clauses interfered with important public policy considerations.[7] This rule has been clarified and expanded by several of the circuits.
 
 
 17
 In re Fleetwood Motel Corp., supra, involved a Chapter X reorganization of a publicly owned hotel corporation. In affirming the district court's decision which refused to enforce a lease termination provision, the Third Circuit concluded that although § 70(b) recognizes the validity of such a provision, the court will not automatically enforce it without an analysis of the impact which would likely result from a forfeiture. The court balanced the equities and concluded that termination would result in a windfall to the landlord of the corporation's only asset, would vitiate the reorganization proceedings and would cause an unnecessary loss to the public shareholders. The court noted that the rationale of Smith, "coupled with the inherent equity powers of a court of bankruptcy, (citation omitted) provide abundant support for the conclusion of the district court (that a forfeiture would not be enforced)." 335 F.2d at 862.
 
 
 18
 Similarly, in Weaver v. Hutson, 459 F.2d 741, the Fourth Circuit upheld the findings and conclusions of the Referee in Bankruptcy which were adopted by the district court. The Referee had refused to terminate a lease pursuant to a termination provision similar to the provision in the instant case.[8] In analyzing the likely effects of a forfeiture, the Referee noted, inter alia, that under the guidance of the Trustee, the motel was operating successfully; that the landlord's financial interests were not in jeopardy; that a forfeiture would cause a complete loss to the debtor's creditors, stockholders and debenture holders; and that forfeiture would provide the landlord with a windfall of nearly $1 million. 459 F.2d at 743.
 
 
 19
 In an order denying a petition for rehearing, the court noted that the basis for its decision was that a forfeiture was highly unconscionable and inequitable under the circumstances. 459 F.2d at 745. The court further stated that as a court of equity, the bankruptcy court had the discretion and power to refuse enforcement of the termination provision and rightfully exercised this prerogative. Id.
 
 
 20
 In Queens Boulevard Wine & Liquor Corp. v. Blum, 503 F.2d 202, the Second Circuit upheld the bankruptcy court's refusal to enforce a conditional limitation in a commercial lease which authorized the landlord to terminate the lease in the event the tenant filed a petition under Chapter XI. The court found persuasive those cases discussed above which held a lease termination provision "to be unenforceable when compelling equitable and policy considerations so require." Id. at 206. The court weighed the equities in the case and concluded that it would be inequitable to enforce the termination provision of the lease:
 
 
 21
 In determining whether to enforce the lease termination here, therefore, we must consider not only the interests of the landlord but also those of the debtor and its creditors. Possession by (the debtor) will not prejudice (the landlord), which is protected by a sizeable security deposit, except to deny it a windfall in the form of increased rent to which we hold it is not equitably entitled. Enforcement of the forfeiture, on the other hand, would destroy a now profitable debtor by depriving it of its most valuable asset its location. It would also needlessly injure trade creditors and those outside investors who have furnished capital which has resulted in (the debtor's) rehabilitation. In our view, these individuals stand on no less significant a footing than did the shareholders of the debtors in Weaver and Fleetwood.
 
 
 22
 503 F.2d at 206-07.
 
 
 23
 The Fifth Circuit aligned itself with the principles set forth in the decisions of the Second, Third and Fourth Circuits in In re Fontainebleau Hotel Corp., 515 F.2d 913. In Fontainebleau, the court stated that it is within the equitable power of the district court to decline to enforce a forfeiture of a lease. Id. at 914. The court noted that permitting a forfeiture would circumvent the objectives of a Chapter X reorganization because "(r) eorganization of the hotel would not be possible if the trustee were deprived of possession of the hotel premises, furniture and equipment." Id.
 
 
 24
 In determining whether to enforce the lease termination provision in the instant case, the bankruptcy court considered the interests of the City, the debtor and the creditors. The court weighed the equities and found that the forfeiture resulting from termination of the lease would provide the City with an unconscionable windfall.
 
 
 25
 If the lease were terminated, the City would secure title to property whose fair market value is approximately.$3.6 million and whose value results in large part from improvements made to the property by the debtor and its predecessors; the debtor and its secured and unsecured creditors would receive nothing.
 
 
 26
 If the decision of the bankruptcy court is upheld, however, the lease will not be terminated and the sale to Mayer will occur. The proceeds from the sale will result in fully retiring two trust deed encumbrances on the debtor's leasehold interest amounting to approximately.$2.1 million. Moreover, unsecured creditors holding claims totalling nearly $600,000 will be fully paid and the debtor will realize nearly $1 million in equity, less costs of bankruptcy administration.
 
 
 27
 It is important to note that while a lease forfeiture would severely and adversely impact upon the debtor and the creditors, a sale to Mayer would not unduly prejudice the City's interests.[9] Mayer is a large and successful real estate development and construction company whose financial strength is sound.[10] Moreover, the court specifically found Mayer to be fully capable of maintaining the leasehold premises in a first-rate manner. Furthermore, Mayer has agreed to post a bond in excess of $500,000 to cover the costs of necessary repairs and renovations to the leasehold and the improvements thereon. Finally, the City has been receiving rental payments throughout the pendency of these proceedings. In short, the City is unable to demonstrate that it will incur any actual harm from the sale to Mayer other than a windfall to which it is not equitably entitled.
 
 
 28
 The equities militate overwhelmingly in favor of preventing a forfeiture of the lease. We conclude, therefore, that the bankruptcy court did not abuse its discretion in refusing to enforce the termination provision.
 
 B. Other Alleged Defaults
 
 29
 The City also contends that the lease is in default because (1) the terms of the pending sale to Mayer include hypothecation of the leasehold interest in excess of the current amount; (2) property taxes were not paid and a surety bond was not maintained as required by the lease; and (3) the property and improvements were not maintained at the required standards of maintenance and repair.
 
 
 30
 The lease provides that the leasehold shall not be hypothecated "voluntarily or by operation of law, without the prior written consent of the (City)."[11] The City contends that the lease is in default because it has not given its consent to the terms of the proposed sale to Mayer which provide for hypothecation of the lease in excess of the.$2.1 million encumbrance to which it has already consented in the lease with the debtor. This contention is misdirected. As we discuss in the next section, the bankruptcy court may, in its discretion, order additional hypothecation of the lease if that action is required to culminate a sale of the leasehold interest.
 
 
 31
 The bankruptcy court concluded that the other alleged defaults did not exist. It found that the property taxes and the surety bond had been paid by Glendale Savings, the holder of the leasehold first deed of trust. The court also found that the evidence did not indicate other than ordinary deterioration of the property and that the evidence was insufficient to establish any violation of municipal laws or building codes. Although the evidence in the record with respect to the alleged defaults is conflicting, we cannot say that the court's findings with respect to the alleged defaults were clearly erroneous.[12]
 
 
 32
 Finally, the court found and concluded that the City waived any breaches of the lease by its conduct since the filing of the involuntary bankruptcy proceeding. The City permitted the receiver to make substantial improvements to the leasehold and to expend considerable funds in its maintenance. Moreover, the court found that the receiver had paid the City periodic rent during the entire Chapter XI proceeding, and that the City had accepted the same without written reservation or complaint. We agree with the bankruptcy court that based upon these facts the City has waived any alleged defaults by its conduct since the inception of the bankruptcy proceedings.
 
 
 33
 III. TRANSFER OF THE LEASEHOLD INTEREST OVER THE CITY'S OBJECTION
 
 
 34
 The City presents a multi-faceted attack to the bankruptcy court's judgment that the consent of the City to the transfer of the leasehold was unnecessary. The City contends (1) that the receiver failed to assume the lease properly and therefore had nothing to transfer; (2) that the provisions of the lease prohibit transfer of the leasehold without the City's consent; and (3) that the bankruptcy court lacked jurisdiction to order transfer of the lease to Mayer. We will examine each of these arguments separately.
 
 A. Assumption of the Lease
 
 35
 The City contends that the receiver did not properly assume the lease. The bankruptcy court found, however, that the conduct of the debtor and receiver throughout the Chapter XI proceeding was consistent with an assumption of the lease. That finding is not clearly erroneous.
 
 
 36
 In a Chapter XI proceeding, an executory contract can be rejected by the debtor or the receiver only in accordance with §§ 313(1) and 357(2) of the Bankruptcy Act, 11 U.S.C. §§ 713(1), 757(2).[13] Unless the contract is so rejected, the contract continues in effect. See Smith v. Hill, 317 F.2d 539, 542 n.6 (9th Cir. 1963); 8 Collier on Bankruptcy, P 3.15(6), p. 204 (14th ed. 1978).
 
 
 37
 While § 70(b) of the Bankruptcy Act requires the receiver to file a sworn statement expressing which of the debtor's contracts have been rejected, there is no such requirement for the assumption of an executory contract. "An assumption may be shown by word or deed consistent with the conclusion that the trustee intended to assume." In re Steelship Corp., 576 F.2d 128, 132 (8th Cir. 1978); See Brown v. Presbyterian Ministers Fund, 484 F.2d 998, 1007 (3rd Cir. 1973) (assumption of an executory contract may be shown by acts or oral statements of the trustee as well as by formal written declaration).[14]
 
 
 38
 In the instant case there was no affirmative action by either the debtor or the receiver to reject the lease. Rather, the receiver spent considerable funds on the maintenance of the leasehold and continued to pay rent to the City throughout the bankruptcy proceedings. Given the receiver's conduct which can reasonably be construed as manifesting an intent to assume the lease, and the fact that he did not affirmatively reject it as required under Chapter XI, we conclude that the lease was intended to be and was, for purposes of this case, assumed by the receiver.
 
 B. The City's Consent to Transfer
 
 39
 The City contends that pursuant to Article XII of the lease, the leasehold may not be transferred to Mayer or to any other party without its consent.[15] The City has insisted that Mayer agree to four conditions before it consents to transfer of the leasehold. First, it requested that $150,000 in cash be placed in Mayer's account to assure adequate operating funds. Mayer did not object to this condition. Second, the City sought a substantial cash deposit to be used to pay the actual expenses of necessary repairs and renovations on the property. Mayer agreed that substantial renovations and repairs were necessary and has agreed that a cash deposit would be made to cover these expenses. Third, the City has demanded a transfer fee of $35,000. The lease has no provision empowering the City to assess a transfer fee and Mayer has objected to this requirement. The fourth condition imposed by the City, and one to which Mayer strenuously objects, is that the encumbrances on the leasehold may not exceed.$2.1 million.
 
 
 40
 Section 70(b) of the Bankruptcy Act provides in relevant part:
 
 
 41
 A general covenant or condition in a lease that it shall not be assigned shall not be construed to prevent the trustee from assuming the same at his election and subsequently assigning the same.
 
 
 42
 Section 70(b) codified the long-standing rule that a receiver or trustee in bankruptcy is empowered to sell or assign a lease for the benefit of the debtor's estate irrespective of a general anti-assignment clause which purports to prohibit such action. See e. g., Gazlay v. Williams, 210 U.S. 41, 47, 28 S.Ct. 687, 688, 52 L.Ed. 950 (1908); Armour & Co. v. Callahan, 25 F.2d 584, 586 (4th Cir. 1928); 4A Collier on Bankruptcy P 70.44(3), p. 544 (14th ed. 1978).
 
 
 43
 The bankruptcy court did not abuse its discretion by refusing to enforce the general anti-assignment provision of the Huntington lease.[16] If the receiver cannot be prevented from assigning the lease to Mayer, a fortiori no consent to the assignment by the City is necessary and the City may not impose conditions to that assignment.
 
 C. JURISDICTION OF THE BANKRUPTCY COURT
 
 44
 The City contends that the bankruptcy court cannot authorize a Chapter XI debtor to sell all or substantially all of its assets without a showing that an emergency situation exists whereby the assets to be sold are perishable. The City also argues that a liquidation plan is inappropriate in a Chapter XI proceeding because that proceeding contemplates the arrangement of debts and the continued existence of the debtor. Finally, it is contended that the court has no jurisdiction to authorize a sale of the leasehold which will result in a long-term contractual relationship between the City and Mayer on terms which purportedly are materially different from those to which the City and debtor had agreed.
 
 
 45
 Section 313(2) of the Bankruptcy Act, 11 U.S.C. § 713(2), provides that a bankruptcy court in a Chapter XI proceeding may "upon cause shown, authorize the receiver or trustee, or the debtor in possession, to lease or sell any property of the debtor, whether real or personal, upon such terms and conditions as the court may approve." The question of what constitutes "cause shown" has been the subject of previous litigation. The City relies upon In re Pure Penn Petroleum Co., 188 F.2d 851 (2nd Cir.1951) for the proposition that a Chapter XI debtor cannot receive authorization from a bankruptcy court to sell all or substantially all of its assets without a showing that an "emergency" situation exists. In Pure Penn Petroleum the Second Circuit analogized § 313(2) to the identically worded § 116(3), 11 U.S.C. § 516(3), which applies to a Chapter X proceeding. Under § 116(3), "cause shown" had been interpreted to mean that a sale must be "confined to emergencies where there is imminent danger that the assets of the ailing business will be lost if prompt action is not taken." In re Solar Mfg. Corp., 176 F.2d 493, 494 (3rd Cir.1949). In Pure Penn Petroleum the Second Circuit held that "cause shown" under § 313(2) should be given the same interpretation as it is given under § 116(3). 188 F.2d at 854.
 
 
 46
 The City urges us to adopt the Pure Penn Petroleum interpretation of "cause shown" under § 313(2). We decline to do so. The overly restrictive view announced in In re Solar Mfg. Co. that a sale of assets in a Chapter X proceeding may be authorized only in an emergency situation has been previously rejected by this court. See In re Wonderbowl Inc., 515 F.2d 18, 19-20 (9th Cir.), cert. denied, 423 U.S. 869, 96 S.Ct. 134, 46 L.Ed.2d 99 (1975); In re Equity Funding Corp. of America, 492 F.2d 793, 794 (9th Cir.), cert. denied, 419 U.S 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974). The inflexibility of the Solar and Pure Penn Petroleum interpretation of "cause shown" is inconsistent with the rehabilitative purposes of the bankruptcy laws. Although the purpose of a Chapter XI arrangement, as with a Chapter XI reorganization, is to preserve a viable business enterprise where possible and especially when that will be in the best interest of creditors, Queens Boulevard Wine & Liquor Corp. v. Blum, 503 F.2d at 206, 11 U.S.C. § 766, circumstances not present or reasonably obvious at the inception of the Chapter XI proceeding may warrant the court's subsequent finding that a sale of assets is in the best interests of creditors.
 
 
 47
 If a Chapter XI proceeding is filed in good faith with the intention of restructuring the debtor's ailing financial situation, and if it subsequently appears that a sale of assets is in the best interests of the estate, it is within the power of the bankruptcy court to authorize such a sale. See In re Pure Penn Petroleum Co., 188 F.2d at 856 (Swan, J., dissenting); 8 Collier on Bankruptcy P 3.16(3) pp. 220-224 (14th ed.1978). In the instant case, the bankruptcy court found that the debtor converted the involuntary bankruptcy proceeding to Chapter XI with the good faith intention of arranging its unsecured debts.[17] At the time the Chapter XI petition was filed, the debtor's business had severely deteriorated. Despite his best efforts over many months to revitalize the business, the receiver was unsuccessful. Only then did the receiver conclude, with the court's approval, that a sale of the leasehold interest was in the best interest of the debtor and his creditors.
 
 
 48
 Finally, the City contends that the court exceeded its jurisdictional grant under the Bankruptcy Act by compelling a long-term contractual relationship between two parties, neither of whom have sought relief under the Act. The City argues that by denying its purported right to exercise consent to the assignment and by declining to limit the amount of encumbrance on the leasehold interest to.$2.1 million, the court will vest Mayer with greater rights under the lease than those that were possessed by the debtor. It is asserted that this action impermissibly abrogates the City's contractual rights. The City contends that if the judgment of the bankruptcy court is affirmed, the City will be required to accept absolutely any amount of encumbrance upon the leasehold interest. The City further asserts that it will be prejudiced by the increased encumbrance because Mayer will be unable adequately to maintain the leasehold due to the increased debt service that will be required by the additional encumbrance. We disagree.
 
 
 49
 The bankruptcy court is expressly invested by statute with original jurisdiction to conduct proceedings under the Bankruptcy Act.[18] These courts are essentially courts of equity, Katchen v. Landy, 382 U.S. 323, 327, 86 S.Ct. 467, 471, 15 L.Ed.2d 391 (1966); Local Loan Co. v. Hunt, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934) and "have summary jurisdiction to adjudicate controversies relating to property over which they have actual or constructive possession." Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 481, 60 S.Ct. 628, 630, 84 L.Ed. 876 (1940); Cline v. Kaplan, 323 U.S. 97, 98-99, 65 S.Ct. 155, 156-57, 89 L.Ed. 97 (1944); PIC Realty Corp. v. Evans, 605 F.2d 476, 479 (9th Cir.1979).
 
 
 50
 The jurisdictional predicates for the court's actions in the instant case are §§ 311 and 313(2) of the Bankruptcy Act, 11 U.S.C. §§ 711, 713(2). Section 311 vests the bankruptcy court with exclusive jurisdiction over the property of a Chapter XI debtor, wherever the property is located. Section 313(2) vests the court with authority to authorize a debtor or receiver to sell or lease the debtor's real or personal property "upon such terms and conditions as the court may approve." This court has previously recognized that "property" under § 311 consists of a leasehold interest. PIC Realty Corp. v. Evans, 605 F.2d at 481-82. We hold that §§ 311 and 313(2) of the Bankruptcy Act provide the bankruptcy court with the requisite jurisdictional authority in the instant case to order the sale of the leasehold interest without the City's consent and on terms, including increased hypothecation, which will lead reasonably to a successful culmination of the transaction.[19]
 
 
 51
 We recognize that in ordering a sale of the leasehold interest and by permitting additional hypothecation, the bankruptcy court decision impacts upon the property interests of the City by altering the contractual rights to which it originally agreed under the terms of the lease with the debtor. The fact that the court's order alters the City's property rights is not, standing alone, impermissible, however, for it has long been recognized that "(b)ankruptcy proceedings constantly modify and affect the property rights established by state law." Wright v. Union Central Life Ins. Co., 304 U.S. 502, 517, 58 S.Ct. 1025, 1033, 82 L.Ed. 1490 (1938). The power given Congress by Article I, section 8, of the Constitution to establish uniform laws relative to bankruptcy gives it broad latitude to affect both contract and property rights. Wright v. Union Central Life Ins. Co., supra; Kuehner v. Irving Trust Co., 299 U.S. 445, 452, 57 S.Ct. 298, 301, 81 L.Ed. 340 (1937); Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island and Pacific Railway Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).
 
 
 52
 Effective exercise of the jurisdictional authority under §§ 311 and 313(2) conferred upon the bankruptcy courts by Congress pursuant to its Article I power, requires that the court have the authority to fashion flexible and equitable remedies to meet the exigencies of each particular situation. In the instant case, the court did not exceed its authority by ordering a sale of the debtor's leasehold interest on terms which it found to be reasonably necessary to effectuate the sale. Without such authority, §§ 311 and 313(2) would be empty jurisdictional shells and the court would be rendered impotent to advance effectively and realistically the rehabilitative purposes of the Bankruptcy Act.
 
 
 53
 Nothing in our decision should be construed as a judicial expansion of the bankruptcy court's jurisdiction which would enable the court to adjudicate the rights of third parties to future transactions not directly connected with the debtor's leasehold interest. See PIC Realty Corp. v. Evans, 605 F.2d at 481-82. We simply hold that pursuant to §§ 311 and 313(2) of the Act, the bankruptcy court did not exceed its jurisdiction in authorizing sale of the leasehold interest without the City's consent. Permitting the City to impose conditions on the sale of the leasehold would seriously impede the purposes of the Bankruptcy Act, the major objective of which "is the equitable distribution of the debtor's assets amongst his creditors." Kuehner v. Irving Trust Co., 299 U.S. at 451, 57 S.Ct. at 301. Allowing the City to impose conditions on the assignment of the lease or to prevent an assignment by virtue of a general anti-hypothecation clause would frustrate the purpose of § 70(b) of the Act. It logically follows that if a bankruptcy court has the authority under § 70(b) to render ineffective a general anti-assignment clause, it must also possess the authority to render ineffective a general anti-hypothecation clause which would operate to prevent an otherwise valid assignment of a lease.
 
 
 54
 There may be circumstances where a lessor would be so prejudiced by the assignment of a lease that such an assignment would be inequitable. This, however, is not such a case. There is no evidence in the record that the City would be unduly prejudiced. Mayer, the assignee, is a firm with a sound financial basis. Moreover, the bankruptcy court specifically found that the additional hypothecation sought by Mayer would encumber only Mayer's interest in the property. The City will not be required to subordinate its position as lessor to the encumbrances sought to be placed on the property by Mayer. Furthermore, nothing in the judgment of the bankruptcy court would preclude the City from exercising its rights and protecting its interests once Mayer becomes the lessee. If any of the terms of the lease are subsequently violated, including any attempt by Mayer to further hypothecate the leasehold beyond the amount approved by the bankruptcy court to effect the sale, the City will be fully able to avail itself of the panoply of appropriate actions to protect its interests pursuant to the terms of the lease.
 
 
 55
 The judgment is AFFIRMED.
 
 
 
 *
 Honorable William P. Copple, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 The lease agreement provided that specific improvements to the property were to be constructed, equipped and operated by the lessee at its expense. These improvements will become the property of the City at the termination of the lease. The developed leasehold estate now consists of a 144 room motel, a mobile home park, two cocktail lounges, three restaurants, banquet facilities and a subleased service station
 
 
 [2]
 In 1978 Congress repealed the Bankruptcy Act of July 1, 1898, 11 U.S.C. §§ 1 et seq., and codified and enacted the law relating to bankruptcy as new Title 11, entitled "Bankruptcy." Pub.L. 95-598, Title I, § 101, November 6, 1978, 92 Stat. 2549. Section 403(a) of the new Act, however, provided that
 A case commenced under the Bankruptcy Act, and all matters and proceedings in or relating to any such case, shall be conducted and determined under such Act as if this Act (Pub.L. 95-598) had not been enacted, and the substantive rights of parties in connection with any such bankruptcy case, matter, or proceeding shall continue to be governed by the law applicable to such case, matter, or proceeding as if the Act had not been enacted.
 The new Bankruptcy Code is applicable to cases filed on or after October 1, 1979. Because the action herein was originally filed prior to the effective date of the new Act, we shall analyze these proceedings pursuant to the old Bankruptcy Act.
 
 
 [3]
 The order specifically provided that the $3.65 million purchase price was payable as follows: (1) $50,000 down payment to be deposited in escrow; (2) $2.95 million additional cash through escrow; and (3) $650,000 by execution of a promissory note secured by a purchase money second Deed of Trust, subordinate to the leasehold. The first trust deed was not permitted to exceed $3 million
 
 
 [4]
 At this hearing the court entertained the City's complaint entitled "Complaint for Order Restoring Possession of Real Property and for Relief from Automatic Stay" which had been filed on November 8, 1977. In its complaint the City alleged that the lease was in default because of the existence of the Chapter XI proceedings, the contemplated transfer and further hypothecation of the lease by the receiver's proposed assignment, unpaid possessory interest taxes, the failure to maintain a corporate surety bond, and the failure of the debtor to maintain the property at a standard required by the lease and by applicable local ordinances. The City prayed for an order directing the debtor and the receiver to relinquish possession and control of the premises to the City and for a termination of the automatic stay which would permit the City to file unlawful detainer proceedings in state court
 
 
 [5]
 Article XII of the lease provides in pertinent part:
 Neither this lease nor any interest therein, whether legal or equitable, shall be assigned or sublet, in whole or alienated, pledged, mortgaged or hypothecated, voluntarily or by operation of law, without the prior written consent of the lessor ... nor shall this lease be subject to garnishment or sale under execution in any suit or proceeding which may be brought against or by the lessee. If the lessee, without securing prior written approval of the lessor, attempts to effect such a transfer, assignment, sublease, mortgage, or hypothecation, or a transfer occurs by operation of law, or this lease or any interest therein is subjected to garnishment or sale under any execution in any suit or proceeding brought against or by the lessee, and the same is not released within 15 days, or if the lessee is adjudged bankrupt or insolvent by any court or upon the lessee's making an assignment for the benefit of creditors, the lessor may, at its option forthwith terminate this lease upon written notice thereof to the lessee and thereupon the lessee shall have no further rights hereunder.
 
 
 [6]
 Nothing in the record indicates that the parties intended to define the phrase used in the lease "adjudged bankrupt or insolvent by any court" to mean anything other than a final judgment of bankruptcy or insolvency by a court of competent jurisdiction
 
 
 [7]
 This principle is consistent with the traditional reluctance of courts of equity to enforce lease forfeiture clauses. "(Such clauses) are liberally construed in favor of the bankrupt lessee so as not to deprive the estate of property which may turn out to be a valuable asset." Finn v. Meighan, 325 U.S. 300, 301, 65 S.Ct. 1147, 1148, 89 L.Ed. 1624 (1945). See generally 4A Collier on Bankruptcy P 70.44(3), pp. 542-43 (14th ed. 1978)
 
 
 [8]
 The pertinent provision of the Weaver lease provided: "This lease shall be terminated by any act of the Tenant, the result of which would be to pass by operation of law, or otherwise, any interest of estate in the leased premises to any Trustee or Receiver in bankruptcy..." 459 F.2d at 743
 
 
 [9]
 The City's claim that the sale to Mayer would unduly prejudice its interests with respect to increased hypothecation of the lease is discussed infra
 
 
 [10]
 The bankruptcy court found that Mayer operates the Ambassador Inn chain of approximately one dozen motels consisting of over 2,500 rooms. Moreover, in 1977, Mayer was the sixth largest construction company in the subdivision business in the United States and was the second largest builder in Southern California with gross sales in excess of $90 million
 
 
 [11]
 See note 2, supra
 
 
 [12]
 With respect to the clearly erroneous test, the Supreme Court has stated: "a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)
 
 
 [13]
 If a lease is unexpired at the date of the filing of the bankruptcy petition, as in the instant case, it is an executory contract and is subject to the provisions of § 70(b) of the Act. 4A Collier on Bankruptcy P 70.44, p. 539 (14th ed. 1978)
 
 
 [14]
 The City cites Local Joint Executive Board v. Hotel Circle Inc., 613 F.2d 210 (9th Cir. 1980) for the proposition that the receiver could not assume the lease simply by conforming to its terms. A careful reading of that case does not support the City's contention. We stated in a footnote that we disagreed with the Second Circuit's conclusion in Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc., 523 F.2d 164, 170 (2d Cir.), cert. denied, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 389 (1975), that a receiver may assume an executory contract by conforming to its terms. Id. 613 F.2d at 217 n.5. REA Express and Hotel Circle both dealt with executory collective bargaining agreements, however, and our rejection of the Second Circuit's conclusion only extends to the authority of a receiver to assume that specific type of executory contract by conforming to its terms. Hotel Circle should not be read as rejecting in all circumstances the proposition that a receiver may not assume an executory contract by conforming to its terms. There may be times not involving executory collective bargaining agreements, as in the instant case, where the receiver's conformance to the terms of a lease manifests his clear intent to assume the executory contract and where such an assumption is in the best interests of the estate. Hotel Circle should be read, however, for the proposition that a receiver's assumption of an executory contract, be it express or implied by conformance to the terms of the contract, is subject to review by the bankruptcy court. See 4A Collier on Bankruptcy P 70.43(5), p. 530 (14th ed. 1978). The receiver's assumption of the contract may be affirmed or denied by the court depending upon the court's judgment of whether such assumption is in the best interests of the debtor's estate
 
 
 [15]
 See note 2, supra
 
 
 [16]
 Section 70(b) distinguishes between a "general covenant or condition" that a lease shall not be assigned and an "express covenant" that an assignment by operation of law or the bankruptcy of a specified party or of either party shall terminate the lease or give the other party an election to terminate. We have previously discussed the express covenant in the Huntington lease with respect to the transfer of the leasehold to the receiver by operation of law. The clause which purports to prohibit the transfer or assignment of the lease to anyone without the City's consent, however, is a "general covenant or condition" within the meaning of § 70(b). See 4A Collier on Bankruptcy P 70.44(3), pp. 544-45 (14th ed. 1978)
 
 
 [17]
 In fact, the debtor originally opposed the receiver's proposed sale and attempted, albeit unsuccessfully, to find individuals who were willing to purchase an equity interest in the debtor's estate
 
 
 [18]
 Section 2(a) of the Bankruptcy Act, § 2(a), 11 U.S.C. § 11(a) provides:
 (a) The courts of the United States hereinbefore defined as courts of bankruptcy are hereby created courts of bankruptcy and are invested, within their respective territorial limits as now established or as they may be hereafter changed, with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in proceedings under this title....
 
 
 [19]
 This court has previously noted that the bankruptcy court has summary jurisdiction over disputes regarding property within the actual or constructive possession of the bankruptcy court. PIC Realty Corp. v. Evans, 605 F.2d at 479. The record in the instant case does not reveal any evidence that the leasehold was not in the possession of the bankruptcy court acting through the receiver, or that the leasehold interest was possessed by the City or by any other third party. If the City possessed the property and asserted a substantial adverse claim, the bankruptcy court would have summary jurisdiction over that property only if the City consented to such jurisdiction. 605 F.2d at 479; Harrison v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897 (1926). Because the receiver actually possessed the property at issue, the bankruptcy court had summary jurisdiction over the disputed assignment of the lease to Mayer